[Civ. No. 19987.  Second Dist., Div. One.  Apr. 20, 1954.]

W. E. KEELER, Respondent, v. GEORGE L. GLENDON et al., Appellants.

[Civ. No. 19988.  Second Dist., Div. One.  Apr. 20, 1954.]

LOUIS PHILLIP SHIFFMAN, Respondent, v. PERLE E. GLENDON et al., Appellants.

Spiegel, Turner & Wolfson and Albert A. Spiegel for Appellants.

Blanche & Fueller and Bernard A. Neches for Respondents.

DRAPEAU, J.—These cases involve a controversy over brokers' commissions claimed upon a sale of real estate that never was made, and a contract of sale that never was entered into.

Defendants, George L. Glendon and Perle E. Glendon, husband and wife, owned a 23-unit apartment house on San Vicente Boulevard in Santa Monica. They also owned the furniture in 21 of the units. They advertised the property for sale. Whereupon plaintiff Louis P. Shiffman, a real estate broker, contacted them. They told him they would sell for $210,000.

Later on another real estate broker, plaintiff W. E. Keeler, told Mr. Shiffman that he had a client, Mrs. Mabel C. Gross, who would buy the apartment house for $185,000.

On Thursday, October 11, 1951, Mr. Keeler and Mrs. Gross looked the property over. Mrs. Gross authorized Mr. Keeler to offer $185,000 for it, and gave him an order on an escrow company for $1,000, to use to bind the offer. On the evening of that day Mr. Keeler and Mr. Shiffman went to see Mr. and Mrs. Glendon at their home. Most of the time was spent convincing Mr. and Mrs. Glendon that they should cut down their asking price to the offered price.

Defendants finally said that they would sell for the offered price. Then the brokers presented to them a printed form, entitled "Deposit Receipt." Blanks in the form had been filled in in Mr. Shiffman's handwriting. It had theretofore been signed by Mabel C. Gross.

The handwriting described the property, "including all furniture and furnishings on premises." The handwriting also stated that the purchase price was to be $25,000 down, $25,000 secured by a first trust deed, and $135,000 secured by a second trust deed.

Mr. and Mrs. Glendon did not sign this document.

They said that some of the tenants owned some of the furnishings in the apartments, and they themselves had some personal furnishings there that they did not want to sell. And Mrs. Glendon told the brokers that she and her husband would have to have a chattel mortgage on the furniture, and that an inventory would have to be taken.

Then Mr. Shiffman filled out blank spaces in another printed form. The handwriting was different from that in the first instrument in the following particulars: The words "except personal furniture," "escrow to close Nov. 15th," and "2d T.D. becomes 1st T.D. when 1st T.D. is paid off" were written in. Also written in was a provision that $4.250 of the commission would go to Mr. Shiffman, and $5,000 to Mr. Keeler.

Mr. and Mrs. Glendon signed this document, but it was never signed by Mrs. Gross.

The next day, Friday, Mrs. Glendon, Mrs. Gross, and the two brokers proceeded to the apartment house, and started to take the inventory. But they did not complete it that day. Mr. Shiffman had made an appointment for all parties to meet with an escrow agent a 3 o'clock that afternoon. So, in the midst of taking the inventory, they adjourned for the purpose of opening an escrow.

In the escrow office Mrs. Glendon requested that there be included in the agreement that the escrow papers would express a provision that in the event Mrs. Gross should sell the property the amount secured by the second trust deed would be reduced to $100,000, and also that a chattel mortgage of the furniture be prepared during the course of the escrow, and be duly executed by Mrs. Gross. Mrs. Gross said that these requests were reasonable and to go ahead and do it. The escrow instructions prepared at the time provided that sellers were to "furnish a bill of sale for furniture and furnishings at 527 San Vicente Boulevard, Santa Monica, California, as per inventory to be furnished and approved prior to the close of escrow."

Mrs. Gross signed the escrow papers then and there. But Mrs. Glendon refused to sign until her husband looked over the instructions, and until the inventory was completed.

On Saturday morning Mrs. Glendon again refused to sign the escrow papers until the inventory was okayed by her and Mrs. Gross.

Testimony during the trial of the case indicates that the parties considered a completed inventory essential to the transaction. Mr. Keeler said that they planned to take the inventory first and then go to escrow.

"Q. That was to get the matter of the furniture straightened out? A. Yes."

Mrs. Gross wanted to have an inventory; she insisted upon one; while it was incomplete she said she wanted to finish it.

And Mrs. Glendon had good reason to require an inventory

approved by her tenants and by Mrs. Gross. She wanted no misunderstanding as to her right to keep certain articles, and she wanted to be sure that her furniture and furnishings were not confused with the personal belongings of her tenants, and the inventory was necessary to describe the items in the chattel mortgage.

On Monday morning Mrs. Gross notified the escrow agent that she withdrew her consent to decrease the second trust deed indebtedness if she should sell the property. When Mrs. Glendon and Mr. Shiffman arrived at the escrow office that afternoon and were informed of this action of Mrs. Gross, Mrs. Glendon again refused to sign the escrow papers. On this day Mr. Shiffman deposited the completed inventory in the escrow.

On the morning of the next day, Tuesday, Mrs. Gross by a letter from her attorney instructed the escrow agent to cancel the escrow and return her papers. Later, on the same day Mr. and Mrs. Glendon appeared with their executed deed, and the escrow papers signed by them. The escrow agent told them he had some bad news for them, that Mrs. Gross had cancelled the escrow.

The two brokers brought separate actions for their commissions. These actions were consolidated for trial. The judge who heard the evidence found for the brokers. Defendants appealed from the judgments that followed.

The appeals have been briefed, argued, and submitted together. They have, therefore, been considered and disposed of together.

Apparently plaintiffs' theory is that defendants are liable because they would not sign the escrow papers until the inventory was completed. But, as stated, there was no agreement of sale, and no sale was made.

Defendants' covenant to pay commissions is to be found in the document they signed, and is as follows: "I agree to sell said property on above terms and to pay a commission of 5% to broker named therein, or one-half of buyer's deposit, if buyer shall default, but not to exceed the full amount of his commission."

The mutual terms of the contract of sale were not agreed upon in either or both documents presented to defendants. one of which they signed. It follows then that the terms of sale were left for future determination. The parties attempted to negotiate the terms of the sale in the papers going

into the escrow. But this effort was terminated by Mrs. Gross' abrupt cancellation of the escrow.

When Mrs. Gross did that the essential element of her willingness to buy disappeared from the case, and plaintiffs' right of recovery under the theory that they produced a person ready, able and willing to buy defendants' property failed.

Moreover, our law has always required a broker to bring a sale to a point where there is a valid and enforceable agreement between seller and buyer before he is entitled to a commission.

"Before a broker is entitled to compensation, the negotiations which he is authorized to make must be concluded or conducted to the state where, as to all the material or essential terms of the sale, there is a meeting of the minds or an agreement between the principal and the customer produced by him; but if the principal and customer are unable to come to terms, the broker cannot recover." (*Lawrence Block Co.* v. *Palston,* 123 Cal.App.2d 300, 308 [266 P.2d 856]; *Love* v. *Gulyas,* 87 Cal.App.2d 608, 618 [197 P.2d 405]; *Silva* v. *Goldman,* 117 Cal.App. 423 [4 P.2d 191]; 12 C.J.S. 184, § 84 et seq.)

"Plaintiff was entitled to a commission only if defendant and Neidorf came to a meeting of the minds as to the terms of sale and if the contract did not fail of consummation through the fault of defendant. (*Stanton* v. *Carnahan,* 15 Cal.App. 527 [115 P. 339].)" (*Lawrence Block Co.* v. *Palston, supra,* 123 Cal.App.2d 300, 308.) In 9 California Jurisprudence 2d, section 80, page 242, it is said: "The duty assumed by him (the broker) is to bring the principal and the customer to an agreement, and until this is done, his right to commissions does not accrue."

It follows therefore that in the cases at bar the brokers are not entitled to any commissions.

The judgments are and each is reversed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied May 10, 1954, and respondents' petitions for a hearing by the Supreme Court were denied June 16, 1954.